53 A.3d 424

GEORGIA–PACIFIC, LLC f/k/a Georgia–Pacific Corporation

v.

Jocelyn Anne FARRAR.

No. 751, Sept. Term, 2010.

Court of Special Appeals of Maryland.

Sept. 26, 2012.

524

526

James L. Shea (Mitchell Y. Mirviss, David S. Gray, Venable LLP, F. Ford Loker, Jr., Robin Silver, Miles & Stockbridge PC, on the brief), Baltimore, MD, for Appellant.

Edward J. Lilly (Thomas P. Kelly, William G. Minkin, Jennifer L. Lilly, Law Office of Peter G. Angelos, on the brief), Baltimore, MD, for Appellee.

Panel: KEHOE, WATTS, and MELANIE M. SHAW–GETER (Specially Assigned) JJ.

KEHOE, J.

On September 8, 2008, appellee, Ms. Jocelyn Farrar, sued over thirty defendants in the Circuit Court for Baltimore City alleging, *inter alia,* negligence, breach of warranty, and strict products liability, for failing to warn her about the toxic fibers found in the defendants' respective asbestos products. This appeal involves only one of the original defendants: appellant, Georgia–Pacific, LLC. Ms. Farrar's complaint alleges that, decades ago, she was exposed to asbestos fibers from a Georgia–Pacific product found on the clothing of her grandfather, who worked at a construction site near Georgia–Pacific products that contained asbestos. Ms. Farrar has since devel-

oped mesothelioma, a disease strongly linked to asbestos exposure.

On October 15, 2009, a jury trial commenced on the claims against Georgia–Pacific. The jury returned a general verdict finding that Ms. Farrar's exposure to Georgia–Pacific's product was a substantial factor in causing her injuries. A judgment was entered in favor of Ms. Farrar against Georgia–Pacific in the amount of $4,995,018.75. Georgia–Pacific noted this appeal on June 2, 2010 and presents the following questions to this Court:

1. Did the circuit court err by failing to rule, as a matter of law, that Georgia–Pacific had no duty to warn a household resident of the risk of exposure to asbestos fibers carried home by a bystander who worked at a construction site where a Georgia–Pacific product allegedly was used by other workers?

2. Did the plaintiff introduce sufficient evidence of frequent, close, and regular exposure to asbestos from a Georgia–Pacific product to prove that it was a substantial contributing cause of her injuries?

3. Did the circuit court err by issuing a coercive *Allen*-type charge in response to an allegedly ambiguous verdict before determining whether the jury was deadlocked?

We perceive no reversible error. We will affirm the jury verdict in favor of Ms. Farrar.

### FACTUAL AND PROCEDURAL BACKGROUND

Ms. Farrar's grandfather, Mr. Hentgen, worked as a union insulator using products containing asbestos in construction projects for almost fifty years, from 1925 into the 1970s. Ms. Farrar alleges that Mr. Hentgen was exposed to a toxic Georgia–Pacific product when he worked on the construction of the Forrestal Building in Washington, D.C. She further alleges that this toxic product contributed to her mesothelioma when she washed her grandfather's work clothes that were covered in asbestos dust. The following testimony was adduced at trial to support Ms. Farrar's case.

Evidence that Mr. Hentgen's clothing contained
asbestos from a Georgia–Pacific product

Mr. Joseph Galvagna, who worked with Mr. Hentgen at the
construction site of the Forrestal Building, testified to the
following. Mr. Galvagna worked at the Forrestal construction
site for about six or seven months beginning in December of
1968. Messrs. Galvagna and Hentgen were employed by the
same sub-contractor and the witness saw Mr. Hentgen at least
a few times a day over this six or seven month time period.
Mr. Hentgen was a mechanic at the job site. He installed
insulation on pipes, ducts, boilers and chillers. Mr. Galvagna
was a first year apprentice at the job site. It was Mr.
Galvagna's job to make sure the mechanics had all of the
material they needed, to clean up after them, and to move
equipment for them. They worked eight hours a day, five
days a week. Many other types of tradesmen and craftsmen
worked at the Forrestal construction site, including electri-
cians, drywall workers, flooring workers, ceiling workers and
steamfitters (the workers who installed the pipes that Mr.
Hentgen insulated).

At trial, Mr. Galvagna was specifically asked about the type
of drywall work that was performed at the Forrestal Building.
Mr. Galvagna explained that there was a "tremendous
amount" of drywall work done at the Forrestal Building.
Drywall work consisted of cutting pieces of drywall with a
utility knife and fastening those pieces of drywall to wood or
metal studs with a drill gun. Workers then apply two or three
coats of drywall cement between the sheets of drywall to fill in
the seams between individual pieces. Subsequently, according
to Mr. Galvagna, the workers waited for the cement to dry
and sanded "the cement down so that when they painted it,
you couldn't see where they had made the joints."

Mr. Galvagna testified that sanding created "quite a bit of
dust" that "would sometimes just fly around in the air." He
further testified that a clean up crew would clean up the dust
with a broom and a shovel after the dust settled and "would
stir it back up again." According to Mr. Galvagna, much of

the drywall cement was packaged in five gallon Georgia–Pacific buckets. He knew the drywall was a Georgia–Pacific product because Georgia–Pacific "was written on both sides of the bucket in nice plain legible letters." Mr. Galvagna recalled seeing hundreds of these Georgia–Pacific buckets at the Forrestal job site. He did not recall seeing warning labels on any of the buckets.

The Georgia–Pacific drywall product was called Ready–Mix. Ready–Mix was manufactured by Georgia–Pacific from 1963 to approximately 1977. The asbestos component of Ready–Mix was approximately 1.5 percent to 5 percent chrysotile asbestos. Georgia–Pacific indicated that Ready–Mix was normally applied as a taping, finishing, or texturing material over joints, fastener heads, corners, and entire areas of gypsum wallboard. An asbestos-free formulation of Ready–Mix was introduced in 1976. There was no indication at trial that Mr. Hentgen ever personally used the Georgia–Pacific Ready–Mix product.

Mr. Galvagna testified that Mr. Hentgen would sometimes work within four to five feet of the drywall workers. Over the course of the six or seven month time period that Mr. Galvagna worked at the Forrestal site, he estimated that Mr. Hentgen worked in the area of the drywall workers "about 50 to 75 percent of the time." When Mr. Hentgen worked around the dust, Mr. Galvagna stated that the dust would settle on Mr. Hentgen's clothing, hair, skin and shoes. Mr. Galvagna testified that Mr. Hentgen did not shower or change his clothes upon leaving the work site.

Mr. Galvagna also remembered seeing other asbestos-containing cement products at the job site. He saw Johns–Manville 7M, Johns–Manville 352 and Eagle–Pitcher cement. These were the cement products used by insulators like Mr. Hentgen. Mr. Hentgen also worked with pipe insulation. The pipe insulation consisted of a product called Kaylo, manufactured by Owens–Corning, and Thermobestos, manufactured by Johns–Manville. These products were used under the hangers that hold the piping in the air.

### Evidence that Ms. Farrar was exposed to a Georgia–Pacific asbestos-containing product

Ms. Farrar attended high school from 1966 to 1970. During that time, she lived with her sister and her aunt at her grandparents' house. Ms. Farrar and her sister had various responsibilities around the house, including dusting, sweeping, vacuuming, mowing the lawn, weeding the garden, and as they got older, doing the household's laundry. Ms. Farrar did the laundry at least once a week during the period her grandfather worked on the Forrestal Building. She not only washed her own clothes, but she cleaned the clothing of other family members as well. Ms. Farrar recalls that her grandfather's work clothing was part of the laundry cycle every week. She specifically remembers shaking her grandfather's work clothes thoroughly because the dust particles attached to his clothing would stick to her navy blue clothing. She was also concerned about the dust from his clothing clogging the drain in the washing machine. After shaking out her grandfather's work clothing, she remembers breathing in the dust that was removed from the clothing. She also remembers having to sweep up dust on the ground that resulted from shaking out her grandfather's work clothes. Ms. Farrar described the dust as whitish-grayish, loose and fluffy.

### Medical evidence of Arthur L. Frank, M.D.

Dr. Frank was accepted by the court as an expert in the fields of internal medicine, occupational medicine, asbestos-related disease and mesothelioma. Dr. Frank testified that asbestos disease is dose related: "the likelihood of getting [the] disease increases with increasing amounts of exposure." He relayed to the jury that, based on Ms. Farrar's medical files and a "fiber burden" analysis that was conducted on the contents of her lungs, she was exposed to more than background levels of asbestos. He further relayed that "[p]eople have actually measured that exposures [to asbestos] in a household ... can be the same as workplace levels when people are working with asbestos." Given the evidence presented by Ms. Farrar, Dr. Frank concluded that all of the

exposures to asbestos from Georgia–Pacific products were contributing factors in the development of Ms. Farrar's mesothelioma. He also stated that all exposures to asbestos—not just exposures to Georgia–Pacific asbestos products—would have, in a cumulative fashion, contributed to the development of her disease.

### Medical evidence of John C. Maddox, M.D.

Dr. Maddox was accepted by the trial court as an expert in the areas of anatomic pathology and the diagnosis and causation of mesothelioma. He testified that mesothelioma can be caused by brief, low-dose, intermittent exposures to asbestos. According to Dr. Maddox, visible asbestos dust is a high concentration of asbestos, requiring a concentration of five million particles of asbestos per cubic foot. He stated that the primary way that asbestos is introduced into the home is on the work clothes of asbestos workers. Once in the home, the dust is not confined to the laundry room, but it migrates through the entire house. This dust can be present for weeks, months or even years.

Dr. Maddox further testified that the risk of developing mesothelioma increases as the dose increases. According to epidemiological studies, a small increase over background levels of asbestos starts to increase the risk of mesothelioma. In addition, in this case a fiber-burden study was conducted on tissue removed from Ms. Farrar's lung. Dr. Maddox testified that the study showed that her exposure to chrysotile asbestos—the type of asbestos used in Georgia–Pacific's product—"was medically significant for certain." Dr. Maddox confirmed that the chrysotile asbestos fiber "contributed to her mesothelioma." Dr. Maddox stated that Ms. Farrar's exposures to the asbestos dust of Georgia–Pacific's Ready–Mix product were above background levels and that Ms. Farrar's exposure to Ready–Mix was a contributing factor in the development of her cancer.

### The Lawsuit

On September 8, 2008, Ms. Farrar filed a short form complaint in the Circuit Court for Baltimore City. The com-

plaint set out claims for, *inter alia*, negligence, breach of warranty and strict liability, against numerous defendants. The complaint alleged that her mesothelioma was caused by the conduct of various defendants. On October 15, 2009, a jury trial commenced on claims against Georgia–Pacific and three absent cross-claim defendants. Georgia–Pacific argued that, as a matter of law, it did not owe a duty to warn household residents of workplace bystanders about asbestos exposure. It subsequently moved for judgment on the issue but this motion was denied by the trial court.

On October 30, 2009, after six hours of deliberations, the jury returned a general verdict finding that Ms. Farrar's exposure to Georgia–Pacific's product was a substantial factor in causing her injuries. The jury awarded $95,575 for past medical expenses; $75,000 for future medical expenses; $1,600,000 for future economic losses; and a verdict of "undetermined" for past and future non-economic losses. The court and counsel subsequently engaged in a discussion about the meaning of "undetermined" and conversed on how best to move forward to obtain a complete verdict. The court decided to give the jury an *Allen*-type charge and dismissed the jury for further deliberations. After these further deliberations, the jury replaced "undetermined" with an award of $18,500,000 for past and future non-economic losses. Of the total award of $20,272,575, Georgia–Pacific's proportionate share was $5,013768.75, due to jury findings that products of various cross-claim defendants were substantial factors in causing the alleged injuries and to reflect a payment to Ms. Farrar by the Manville Settlement Trust.

After the trial court entered judgment against Georgia–Pacific in this amount, Georgia–Pacific moved for judgment notwithstanding the verdict, or, in the alternative, for new trial or remittitur. With Ms. Farrar's consent, the trial court granted JNOV in part on May 4, 2010, reducing the verdict by $75,000 to $20,197,575 ($4,995,018.75 against Georgia–Pacific), but otherwise denied JNOV. On May 19, 2010, the trial court entered judgment in that amount and, on May 25, revised that

judgment with minor changes and entered a new judgment. Georgia–Pacific noted this appeal on June 2, 2010.

## ANALYSIS

Our analysis is divided into three parts. In Part I, we consider whether the trial court erred in denying Georgia–Pacific's motion for judgment on the question of whether Georgia–Pacific owed a legal duty to warn Ms. Farrar. Part II addresses whether Ms. Farrar presented sufficient evidence at trial to establish that Georgia–Pacific's asbestos product was a substantial factor in causing her mesothelioma. Finally, in Part III, we analyze whether the trial court erred in dismissing the jury for further deliberations after the jury returned an incomplete verdict sheet.

### I. The Duty to Warn

Georgia–Pacific argues that "the trial court erroneously expanded the duty [to warn] beyond manageable bounds to an indeterminate class of persons . . . [b]y extending the duty to the household member (Ms. Farrar) of a bystander (Mr. Hentgen) of product users (the drywallers)." Ms. Farrar contends that "[t]he trial court was legally correct in . . . finding that the appellant owed a legal duty to the appellee" because she "was owed an individual duty to be warned of the latent dangers of asbestos exposure, which she experienced as a direct result of the use of [Georgia–Pacific's] products in proximity to her grandfather."

At trial, Georgia–Pacific moved for judgment at the close of Ms. Farrar's case arguing that it did not owe a duty to Ms. Farrar. The trial court denied the motion. After the close of evidence, Georgia–Pacific again moved for judgment and the trial court again denied the motion. Finally, after a jury verdict in favor of Ms. Farrar, Georgia–Pacific moved for judgment notwithstanding the verdict based on the lack of duty and the trial court again denied this motion.

 "We review the grant of a motion for judgment under the same standard as we review grants of motions for

judgment notwithstanding the verdict." *Orwick v. Moldawer*, 150 Md.App. 528, 531, 822 A.2d 506 (2003) (citations omitted). "We assume the truth of all credible evidence on the issue, and all fairly deducible inferences therefrom, in the light most favorable to the party against whom the motion is made." *Id.* "Consequently, if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration." *Id.* at 532, 822 A.2d 506.

We turn to the question of whether Georgia–Pacific owed a duty to Ms. Farrar to warn her of the latent dangers associated with its asbestos product.[1]

■ The Court of Appeals recognized a framework for analyzing a manufacturer's duty to warn in *Moran v. Faberge, Inc.*, 273 Md. 538, 332 A.2d 11 (1975). In *Moran*, a products liability action against a cologne manufacturer alleging the negligent failure to warn of concealed dangers, the Court concluded that the manufacturer's "failure to place a warning on its [cologne bottle] constituted actionable negligence." *Id.* at 554, 332 A.2d 11. The Court stated the following regarding a manufacturer's duty to warn:

[I]n the products liability domain a duty to warn is imposed on a manufacturer if the item it produces has an inherent and hidden danger about which the producer knows, or should know, could be a substantial factor in bringing injury to an individual or his property when the manufacturer's product comes near to or in contact with the elements which are present normally in the environment where the product can reasonably be expected to be brought or used.

*Id.* at 552, 332 A.2d 11.

■ In *Eagle–Picher Industries, Inc. v. Balbos*, 326 Md. 179, 604 A.2d 445 (1992), the Court of Appeals applied the

---

1. With regard to the question of duty, the parties do not dispute that Georgia–Pacific manufactured an unsafe product or that Georgia–Pacific owed a duty to warn certain individuals of the harmful impact of its asbestos product. The only question is whether Ms. Farrar falls within the class of people to whom the duty was owed.

*Moran* products liability framework in the context of an asbestos case. With regard to the scope of potential plaintiffs, the *Balbos* Court stated:

"[T]he pertinent inquiry is not whether the actual harm was of a particular kind which was expectable. Rather, the question is whether the actual harm fell within a general field of danger which should have been anticipated."

*Balbos,* 326 Md. at 196, 604 A.2d 445 (quoting *Moran,* 273 Md. at 551, 332 A.2d 11).

Our Court applied this doctrine in yet another asbestos case in *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 191, 692 A.2d 5 (1997), *vac'd on other grounds sub nom., Porter Hayden Co. v. Bullinger,* 350 Md. 452, 713 A.2d 962 (1998). In *Grimshaw,* we expressed that, in the context of a products liability action, "[o]ur case law . . . makes clear that manufacturers have a duty to warn all individuals in the foreseeable zone of danger." *Id.* (citing *Moran v. Faberge,* 273 Md. 538, 332 A.2d 11 (1975)). "The duty of the manufacturer to warn of latent dangers inherent in its product goes beyond the precise use contemplated by the producer and extends to all those which are reasonably foreseeable." *Id.* at 192, 692 A.2d 5 (citing *Moran,* 273 Md. at 545, 332 A.2d 11).

In the *Grimshaw* case, four mesothelioma plaintiffs "all filed suits in the [Circuit Court for Baltimore City] against numerous defendants, alleging that he or she contracted asbestos-related mesothelioma from either workplace or household exposure to defendants' products." *Id.* at 144, 692 A.2d 5. One such plaintiff was Ethel Granski. The facts surrounding Granski's exposure to asbestos are very similar to the facts of this case:

Ethel Granski was born on August 23, 1948. From 1953 to 1963, Gene Abrams, Ethel Granski's stepfather, was either living with or married to Granski's mother, Rose Abrams. During this period of ten years, Abrams worked at various places, including Newport News Shipbuilding and Drydock, as an insulator, where, he claims, he was exposed to asbestos-containing products. When Granski was eight or nine,

she began washing Abrams's work clothes, which allegedly were covered in asbestos dust when carried into their home. Granski became ill as a result of asbestos exposure and was diagnosed with mesothelioma in August 1993. Granski was still living at the time of trial.

*Id.* at 148, 692 A.2d 5. Like Ms. Farrar, Granski claimed that her mesothelioma resulted from exposure to asbestos dust that became airborne while washing a family member's work clothes. The jury returned a verdict in favor of Granski against, inter alia, Owens–Corning, f/k/a Owens–Corning Fiberglas Corporation ("OC"), who manufactured a hazardous asbestos-containing insulation product called Kaylo. *Id.* at 145, 692 A.2d 5. On appeal, OC contended "that it is not liable for Granski's household exposure to asbestos fibers because Granski's injuries were not foreseeable and, therefore, it owed her no duty to warn." *Id.* at 191, 692 A.2d 5. This Court disagreed. In an opinion written by Judge Arrie Davis, we stated:

> [I]n the case before us, the evidence supported the conclusion that OC could reasonably expect that workers would bring home work clothes covered in asbestos dust and thereby expose their families to harm. This is so because OC knew or should have known that its asbestos-containing insulation product, Kaylo, was a hazardous product. Thus, OC could reasonably foresee that the use of its product, which results in asbestos dust becoming airborne and soiling insulators' clothes, may result in workers wearing their asbestos-covered clothes home and exposing their households to harms associated with asbestos dust. It is not necessary that OC foresee the exact manner in which harm could occur, e.g., that a Kaylo insulator's family member might be exposed to hazardous asbestos fibers when washing the worker's clothing.
>
> The evidence presented, if believed, established that Granski's stepfather worked with the asbestos-containing insulation product manufactured by OC, under the trade name of Kaylo, between 1955 and 1961. Granski lived with her stepfather between 1953 and 1963 and was responsible for

washing his work clothes. Granski testified that her stepfather's clothes were very dirty and covered in a whitish-gray dust. Articles were introduced to prove that OC knew or should have known of the hazards of airborne asbestos fibers released from Kaylo insulation. The fact that the ultimate harm suffered was not foreseeable does not preclude liability.

Moreover, Dr. Dement testified as an expert that known in the industry since 1930 is the fact that it is important for workers not to bring toxic substances home on their clothing and thereby expose their families to it. Dr. Dement stated that workers need to know that their clothes can become contaminated and expose their families. Asbestos fibers do not biodegrade and could cause continuous exposure of asbestos. Finally, Dr. Mark concluded that Granski's exposure to asbestos from her stepfather's work clothes caused her malignant mesothelioma. A jury, therefore, could reasonably conclude that Granski's injuries were foreseeable and that OC had a duty to warn of household exposure.

*Id.* at 193–94, 692 A.2d 5 (citations omitted). The same evidence exists in this case. The evidence established that Ms. Farrar's grandfather worked at a construction site surrounded by an asbestos-containing insulation product manufactured by Georgia–Pacific for about six to seven months. Ms. Farrar lived with her grandfather during this period and was responsible for washing his work clothes. Ms. Farrar testified that her grandfather's clothes were covered in a whitish-grayish dust. Articles were introduced to prove that Georgia–Pacific knew or should have known of the hazards of airborne asbestos fibers released from the Georgia–Pacific joint compound. "The fact that the ultimate harm suffered was not foreseeable does not preclude liability." *Id.* at 193, 692 A.2d 5.

■ The question of duty in this case is controlled by the principles set forth in *Moran, Balbos* and *Grimshaw.* The *Grimshaw* case is especially on point because of its factual similarities to our case. These cases impose a duty on Geor-

gia–Pacific to warn people like Ms. Farrar of its dangerous products.

Georgia–Pacific argues that *Grimshaw* is inapposite and that Ms. Farrar's claim of a duty fails to meet the Maryland standards as expressed in *Gourdine v. Crews,* 405 Md. 722, 955 A.2d 769 (2008), *Doe v. Pharmacia & Upjohn Co.,* 388 Md. 407, 879 A.2d 1088 (2005), *Dehn v. Edgecombe,* 384 Md. 606, 865 A.2d 603 (2005) and *Adams v. Owens–Illinois, Inc.,* 119 Md.App. 395, 705 A.2d 58 (1998). We will address each of Georgia–Pacific's contentions in turn.

Georgia–Pacific argues that *Grimshaw* is inapposite for a number of reasons. It contends that *Grimshaw* was a "direct" bystander case—in that the plaintiff was a family member of an asbestos worker who worked directly with the defendant's asbestos-containing product—"and thus does not address the thrice-removed exposure at issue here." We do not think the *Grimshaw* opinion is so limited; it is not clear from the opinion whether Granski's stepfather, Abrams, was a direct user of OC's asbestos product or not. In fact, the connection between Abrams and the OC asbestos product was more tenuous in *Grimshaw.*

The relevant evidence in *Grimshaw* showed the following: Abrams explained that, during his furloughs with his employer C & O Railroad, he would work at the Newport News Shipbuilding and Drydock. *Id.* at 197, 692 A.2d 5. Abrams testified that he worked at the Shipyard off and on between 1955 and 1960 as an insulator, covering pipes and mixing mortar and asbestos. *Id.* He testified to this even though the Shipyard and the social security administration had no record of Abrams working at the Shipyard during this time. Moreover, Abrams was unable to recall the names of the products or people that he worked with aboard the ship. *Id.* The connection between Abrams and OC Kaylo was established by two witnesses who worked on the same vessels at the same times as Abrams. The two witnesses testified that OC Kaylo was used and stored extensively on the relevant vessels. *Id.* Notably absent from the testimony was a statement by anyone

that Abrams ever worked directly with the OC Kaylo product. Thus, we do not conclude that *Grimshaw*'s analysis is limited to "direct bystander" cases.

Second, Georgia–Pacific argues that "*Grimshaw* ruled only that sufficient evidence existed to submit the issue to the jury; it did not examine whether a duty existed as a matter of law, as required here." We read *Grimshaw* differently. The *Grimshaw* Court specifically addressed the question of "whether a manufacturer has a duty to warn of the dangers of household exposure to asbestos." *Id.* at 191, 692 A.2d 5. The Court concluded that "[o]ur case law ... makes clear that manufacturers have a duty to warn all individuals in the foreseeable zone of danger." *Id.* (citing *Moran,* 273 Md. 538, 332 A.2d 11 (1975)). The Court held that, as long as the jury finds the injuries to be foreseeable, OC had a duty to warn Granski of the dangers of household exposure to asbestos. *Id.* at 194, 692 A.2d 5.

Finally, Georgia–Pacific argues that *Grimshaw* is inapposite because "*Grimshaw*'s analysis is directly at odds with subsequent decisions holding that a duty did not run to a spouse or household member despite the foreseeability of harm." Specifically, Georgia–Pacific contends that "a steady wave of decisions, starting with *Adams* [and *Dehn*] and culminating in *Gourdine* and *Pharmacia,* have found no duty in much less attenuated relationships than here." According to Georgia–Pacific, "[u]nder now-settled law, a manufacturer does not owe a duty to warn" under the facts of this case, and "[p]er these decisions, the nexus between Ms. Farrar and Georgia–Pacific is far too attenuated to establish a duty." We turn now to discuss the impact of *Adams, Dehn, Pharmacia* and *Gourdine* on a manufacturer's duty to warn in an asbestos case.

Georgia–Pacific first cites *Adams v. Owens–Illinois, Inc.,* 119 Md.App. 395, 705 A.2d 58 (1998). In *Adams,* the wife of an asbestos worker contracted asbestosis from washing her husband's work clothing. *Id.* at 410, 705 A.2d 58. The wife sued her husband's employer, Bethlehem Steel, for its failure to warn of latent dangers in the workplace. *Id.* The wife

challenged the trial court's refusal to grant a jury instruction describing this duty to warn. *Id.* We concluded that the jury instruction was properly refused because the wife was not an employee of Bethlehem Steel and "Bethlehem owed no duty to strangers based upon providing a safe workplace for employees." *Id.* at 410–11, 705 A.2d 58.

 The *Adams* case is not fully on point because it involved the legal relationship between an employer and its employee. The scope of an employer's liability to its employees is not the same as the scope of a manufacturer's liability to a person who comes into contact with its product. In the employer-employee context, an employer owes a duty to its employees to furnish a safe place to work. *Lane v. Bethlehem Steel Corp.*, 107 Md.App. 269, 277, 667 A.2d 962 (1995). The liability depends on whether an employee suffers harm in an environment under the employer's control. *Id.* This is wholly different from a products liability claim.

 " '[I]n the products liability domain a duty to warn is imposed on a manufacturer if the item it produces has an inherent and hidden danger about which the producer knows, or should know, could be a substantial factor in bringing injury to an individual ...' " *Gourdine*, 405 Md. at 739, 955 A.2d 769 (quoting *Moran*, 273 Md. at 552, 332 A.2d 11). Thus, the scope of the special legal relationship in a products liability case is not confined, as it is in the employer-employee context, to a previously contemplated, often contractual, relationship. The potential class of plaintiffs in a products liability context is more expansive than the potential class of plaintiffs in the employer-employee context. This is why the *Adams* Court concluded that an employer's duty is limited to its employees and that an employee's spouse, as a stranger to the employment relationship, was not owed a duty from her husband's employer.

Georgia–Pacific next relies on *Dehn v. Edgecombe.* In *Dehn*, the Court of Appeals considered whether a physician owed a duty to a patient's wife, who became pregnant following the patient's failed vasectomy, when the wife was not the

doctor's patient and did not have any contact with the doctor. 384 Md. at 610–11, 865 A.2d 603. The Court concluded that, under the circumstances, the doctor did not owe a duty of care to the wife. The Court began its analysis by stating that:

It is the general rule that recovery for malpractice against a physician is allowed only where there is a relationship between the doctor and patient. This relationship may be established by contract, express or implied, although creation of the relationship does not require the formalities of a contract, and the fact that a physician does not deal directly with a patient does not necessarily preclude the existence of a physician-patient relationship. What is important, however, is that the relationship is a consensual one, and when no prior relationship exists, the physician must take some action to treat the person before the physician-patient relationship can be established.

*Id.* at 620, 865 A.2d 603. The Court concluded that the wife did not have a physician-patient relationship with her husband's doctor. *Id.* at 626, 865 A.2d 603. The doctor in the case was not even the doctor who performed the vasectomy and, more importantly, the wife had never met the relevant doctor until the day of trial. *Id.* The Court held that "[a] duty of care to a non-patient is not one which Maryland law is prepared to recognize under these circumstances." *Id.* at 627, 865 A.2d 603.

■ *Dehn* does not control our decision because liability turned on the existence of a doctor-patient relationship, and the wife in *Dehn* was a stranger to this relationship. The duty in *Dehn,* like the duty in *Adams,* was personal to the husband who was part of the special relationship. In our case, liability extends to those that are directly harmed by a defective product. Liability is not contingent on a prior existing relationship between the parties.

Georgia–Pacific also relies on *Doe v. Pharmacia & Upjohn Co.,* another employer-employee liability case. In *Pharmacia,* an employee of *Pharmacia* became infected with a strain of HIV while handling the virus as a lab technician at Pharmacia. 388 Md. at 410–11, 879 A.2d 1088. The employee's wife

contracted the virus from her husband while engaging in sexual relations before the employee discovered that he had the virus. *Id.* The wife filed suit against Pharmacia alleging negligence. The parties disputed whether Pharmacia owed the wife a duty of care. The Court held that Pharmacia "owed no tort duty to the spouse of its employee." *Id.* at 423, 879 A.2d 1088. The Court reasoned that although "it should have been foreseeable to Pharmacia that Mr. Doe's wife could contract the virus," the Court "could not find any Maryland case holding that an employer has a duty to the spouse of an employee." *Id.* at 416–17, 879 A.2d 1088. The Court emphasized that there was "no assertion in the complaint that she was ever an employee of Pharmacia … or that she had ever had any contact with Pharmacia." *Id.* at 420, 879 A.2d 1088. Absent a special relationship with the employer, the Court stated that the wife's theory of liability "would create an expansive new duty to an indeterminate class of people." *Id.*

Again, *Pharmacia* is not controlling. *Pharmacia* involved a negligence claim against an employer; it had nothing to do with a defective product. In *Pharmacia*, the Court stressed that the wife was never an employee of Pharmacia nor did she ever have any contact with Pharmacia. *Id.* at 420, 879 A.2d 1088. Pharmacia was not liable because Maryland does not place a burden on employers to ensure the safety of those who do not work on the employer's premises. In a products liability context, however, the manufacturer of a defective product is liable to those who fall within the foreseeable zone of danger. Again, as stated *supra,* the class of potential plaintiffs in a products liability case is more expansive. *Pharmacia* is not persuasive to our analysis on this point.

The case most in line with Georgia–Pacific's position is *Gourdine v. Crews.* Unlike *Adams, Dehn* and *Pharmacia, Gourdine* is a products liability case. Georgia–Pacific argues that *Gourdine* "is on all fours and is controlling authority" and "leaves no doubt that the Court of Appeals applies [cases like *Adams* and *Pharmacia*] in product liability cases."[2] We do

---

**2.** Georgia–Pacific argues that *Dehn* and *Pharmacia* are applicable, and even controlling, in the products liability context because the *Gourdine*

not agree that the facts of *Gourdine* are "on all fours," and thus, we reach a different result.

*Gourdine* involved a driver of an automobile, Ms. Crews, who was a Type I diabetic taking a combination of insulin medications manufactured by Eli Lilly and Company ("Lilly"), while operating her car. 405 Md. at 726, 955 A.2d 769. The complaint alleged that Ms. Crews "suffered a hypoglycemic reaction and experienced a 'blackout' causing her to lose control of her vehicle" and strike the vehicle driven by Mr. Gourdine, causing his death. *Id.* at 726, 728, 955 A.2d 769. The question before the Court of Appeals was whether Lilly owed a duty to Mr. Gourdine, the decedent. *Id.* at 726, 955 A.2d 769. The wife of Mr. Gourdine argued "that it was foreseeable for Lilly that Ms. Crews, allegedly suffering an adverse reaction to the medications, would cause injury and death to third persons while she was operating a motor vehicle, when she had not been adequately warned about the dangers that allegedly were associated with the specified medications, and that such foreseeability, thus, created a duty owed to Mr. Gourdine." *Id.*

The Court of Appeals concluded "that Lilly did not owe a duty to Mr. Gourdine." *Id.* at 754, 955 A.2d 769. After discussing *Dehn* and *Pharmacia* at length, Judge Lynne Battaglia, writing for the Court, stated:

> In the case *sub judice*, there was no direct connection between Lilly's warnings, or the alleged lack thereof, and Mr. Gourdine's injury. In fact, there was no contact between Lilly and Mr. Gourdine whatsoever. To impose the requested duty from Lilly to Mr. Gourdine would expand traditional tort concepts beyond manageable bounds, be-

Court discussed these cases to support its conclusion that a duty to warn was not owed to a bystander plaintiff in the context of a products liability claim. We realize that *Dehn* and *Pharmacia*, although not products liability cases, may be persuasive in a products liability case given the proper factual scenario, but we conclude that, given the factual scenario before us, this is not one of those cases. The facts in *Dehn* and *Pharmacia* are much closer to the facts in *Gourdine* than they are to the facts of this case.

cause such duty could apply to all individuals who could have been affected by [Ms.] Crews after her ingestion of the drugs. Essentially, Lilly would owe a duty to the world, an indeterminate class of people, for which we have resisted the establishment of duties of care.

*Id.* at 750, 955 A.2d 769 (citations and quotation marks omitted). The analysis in this paragraph sets *Gourdine* apart from the facts of our case.

First, the Court concluded that "there was no direct connection between Lilly's warnings, or the alleged lack thereof, and Mr. Gourdine's injury." *Id.* at 750, 955 A.2d 769. The Court did not define what constitutes a "direct connection," but it made clear that there must be some relationship between the faulty product, the potential set of warnings, and the harm suffered by the plaintiff. *Id.* at 751–52, 955 A.2d 769.

The *Gourdine* Court's analysis of *Valk Mfg. Co. v. Rangaswamy,* 74 Md.App. 304, 537 A.2d 622 (1988), *rev'd on other grounds sub nom., Montgomery County v. Valk Mfg. Co.,* 317 Md. 185, 562 A.2d 1246 (1989) is instructive on what can constitute a "direct connection."

In *Valk Manufacturing,* a dump truck with a snowplow hitch mounted on its front caused an automobile accident with the decedent. The decedent's widow and minor child filed suit against the manufacturer of the snowplow hitch alleging negligence and strict liability for "defective design." *Id.* at 313, 537 A.2d 622. A jury awarded the plaintiffs $2,500,000 on the strict liability count, and our Court affirmed the award. *Id.* at 308, 323, 537 A.2d 622. We concluded "that bystanders, such as [the decedent] in this case, are protected under the doctrine of strict liability in tort." *Id.* at 323, 537 A.2d 622.

In *Gourdine,* the Court of Appeals distinguished *Valk Manufacturing* from the facts of the case before it by explaining that in *Valk Manufacturing,* "the defective product was directly involved in the accident and caused the decedent's injury." *Gourdine,* 405 Md. at 751, 955 A.2d 769. Our case is distinguishable from *Gourdine* for the same reason. Assuming the truth of all credible evidence in the light most favor-

able to Ms. Farrar, the defective product, Georgia–Pacific's asbestos-containing Ready–Mix compound, was directly involved in causing Ms. Farrar's injury. Unlike in *Gourdine*, where there was no direct connection between Lilly's product and Mr. Gourdine, in our case, there was a direct connection, in the form of actual physical contact between the harmful dust that originated from Georgia–Pacific's product and Ms. Farrar.[3] Again, viewing the evidence in the light most favorable to Ms. Farrar, it was this physical contact with Georgia–Pacific's harmful product that contributed to Ms. Farrar's mesothelioma.

Second, the *Gourdine* Court concluded that a duty could not be extended to Mr. Gourdine because, if a duty was extended, then such a "duty could apply to all individuals who could have been affected by [Ms.] Crews after her ingestion of the drugs." For example, if Lilly owed a duty to Mr. Gourdine, then Lilly could potentially be held liable for the tort that any of its users inflicted on any third party after ingesting its medicine. This would open the class of plaintiffs to an indeterminate class of people. Maryland law does not allow this, which is why the *Gourdine* Court ruled in favor of Lilly. The Court limited the class of plaintiffs to those that had a direct connection with the manufacturer's product.

In the case before us, extending Georgia–Pacific's duty to Ms. Farrar does not create an indeterminate class of people. Viewing the evidence in the light most favorable to Ms. Farrar, she had physical contact with Georgia–Pacific's harmful product, and this contact contributed to her mesothelioma. Unlike *Gourdine*, where the alleged faulty product caused a product user to injure another human being, the injury in our case resulted directly from the inhalation of the

---

3. In this regard, Ms. Farrar's case is factually similar to *Valk Manufacturing*. The Court's analysis in *Gourdine* may leave open whether there might be circumstances other than direct physical contact that would constitute a "direct connection." It is not necessary for us to address that topic.

product itself. *Gourdine* does not preclude Georgia–Pacific from liability in this case.

In sum, under *Moran, Balbos* and *Grimshaw,* the actual harm inflicted on Ms. Farrar fell within a general field of danger which should have been anticipated, and Georgia–Pacific owed her a duty to warn of the latent dangers associated with its asbestos product. The trial court did not err in denying Georgia–Pacific's motion for judgment on the question of legal duty.

## II. Sufficiency of the evidence showing that a Georgia– Pacific product was substantial factor in causing Ms. Farrar's mesothelioma

Georgia–Pacific argues that the trial court should have granted its motion for judgment because the evidence introduced at trial was insufficient to establish that Georgia–Pacific's Ready–Mix was a substantial factor in causing Ms. Farrar's illness. Ms. Farrar counters that "[t]he evidence in this case proved that the plaintiff was regularly, frequently and proximately-exposed to asbestos fibers brought home on her grandfather's work clothes, and that asbestos fibers released from the use of the Appellant's asbestos-containing joint compound were a significant part of the asbestos exposure that she experienced." Thus, as argued by Ms. Farrar, "[t]he trial court was correct in denying the Motion for Judgment and in submitting the case to the jury."

■■■ "We must review this claim of insufficient evidence through the lens of a motion for judgment, because that is how it surfaced at trial." *John Crane, Inc. v. Puller,* 169 Md.App. 1, 18, 899 A.2d 879 (2006). "A court may grant a motion for judgment only after it 'consider[s] all evidence and inferences in the light most favorable to the party against whom the motion is made.' " *Id.* (quoting Rule 2–519(b)). "Thus, we are not privileged to dissect the evidence and weigh the credibility of its messengers. . . ." *Puller,* 169 Md.App. at 18, 899 A.2d 879; *see also Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 521, 682 A.2d 1143 (1996) (stating that "it is not the

province of an appellate court to express an opinion regarding the weight of the evidence").

Georgia–Pacific contends that Ms. Farrar's evidence of substantial causation is lacking in two ways. It argues (1) that Farrar failed "to prove that she was exposed to fibers from Ready–Mix with such regularity, frequency, and proximity that the exposure was a substantial factor in causing her injury"; and (2) that Farrar's experts inaccurately opined that "*any* exposure above background levels constitutes a substantial factor in causing disease." We will consider each of these arguments in turn.[4]

### (1)

The parties do not dispute that Georgia–Pacific was one of many manufacturers that had asbestos products at the Forrestal Building construction site. In such a scenario, "for an injured plaintiff to prevail against a particular manufacturer or seller of asbestos containing products the plaintiff must prove that exposure to the products made or sold by that defendant was a substantial factor in causing the injury." *John Crane, Inc. v. Linkus*, 190 Md.App. 217, 233, 988 A.2d 511 (2010) (citing *Eagle–Picher Indus., Inc. v. Balbos*, 326 Md.

---

4. As a variant to its argument, Georgia–Pacific contends that Farrar was required to prove that her exposure to a Georgia–Pacific product was *independently* sufficient to cause Farrar's injury. It asserts in its brief that *Eagle–Picher Indus., Inc. v. Balbos*, 326 Md. 179, 208, 604 A.2d 445 (1992), stands for the proposition that "as a threshold matter, Ms. Farrar had to prove that the exposure to Ready–Mix 'operating alone, would have been sufficient to cause the identical result.'" (quoting *Balbos*, 326 Md. at 208, 604 A.2d 445). As we explain in the main text, the law of Maryland, in asbestos cases, is that a plaintiff must prove that a defendant's products were a substantial factor in causing harm. The "but for" test posited by Georgia–Pacific was specifically rejected by the *Balbos* Court:

In products liability involving asbestos, where the plaintiff has sufficiently demonstrated both lung disease resulting from exposure to asbestos and that the exposure was to the asbestos products of many different, but identified, suppliers, no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers.

*Id.* at 209, 604 A.2d 445 (footnote omitted).

179, 210, 604 A.2d 445 (1992)). In this case, Ms. Farrar did not work directly with asbestos products; she was a "bystander" to the asbestos products. For asbestos exposure claims of bystanders, the Court of Appeals has established the "frequency, proximity and regularity" test, which was set out in *Balbos* and reiterated in *Georgia–Pacific Corp. v. Pransky*, 369 Md. 360, 365–66, 800 A.2d 722 (2002):

> "Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, *the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product.* In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease."

*Id.* (quoting *Balbos,* 326 Md. at 210–11, 604 A.2d 445) (emphasis added; internal quotation marks and citation deleted). The issue before this Court is whether Ms. Farrar produced sufficient evidence under this standard to sustain liability.

 When viewed in the light most favorable to Ms. Farrar, the evidence that Ms. Farrar's grandfather, Mr. Hentgen, worked regularly near a Georgia–Pacific asbestos-containing product on a daily basis for six or seven months, and brought his clothes home for Ms. Farrar to wash at least once a week, was legally sufficient to permit a jury question on proximate cause. The denials of Georgia–Pacific's motions for judgment and judgment notwithstanding the verdict were not in error. *See Scapa Dryer Fabrics, Inc. v. Saville,* 418 Md. 496, 505, 16 A.3d 159 (2011) (holding that evidence that the plaintiff worked in arms length to an asbestos-containing

product permitted a jury question on proximate cause). We will mirror the approach conducted in *Scapa* and analyze the facts of this case under each prong of the "frequency, proximity and regularity" test.

With regard to the "frequency" prong, which addresses the "frequency of use" of the product in the workplace, *see Balbos*, 326 Md. at 210, 604 A.2d 445, Mr. Galvagna testified that he worked with Ms. Farrar's grandfather, Mr. Hentgen, at the Forrestal Building construction site and saw him several times a day for a six to seven month period beginning in December 1968. They worked eight hours a day, five days a week. He testified that many of the employees at the site were working with drywall materials and that those people worked closely to Mr. Hentgen. Moreover, Mr. Galvagna testified that the joint compound was stored in five-gallon Georgia–Pacific buckets and that he saw hundreds of these buckets at the job site. Frequency, therefore, was addressed directly by the testimony of Mr. Galvagna and his testimony established that the product was used abundantly in the workplace.

This brings us to the "regularity" prong of the *Balbos* test. "While not explicitly defined in *Balbos* ..., regularity in the context of asbestos exposure indicates periodic exposure [to asbestos dust], i.e., something that happens at regular intervals." *Scapa*, 418 Md. at 506, 16 A.3d 159. Mr. Galvagna testified that the drywall workers worked closely to Mr. Hentgen and that their work in sanding the joint compound drywall released "quite a bit of dust" in proximity to Mr. Hentgen on a regular basis. He testified that this dust used to settle "everywhere," including on Mr. Hentgen's clothing, hair, skin and shoes, and that "[i]t was impossible to get away from it." He testified that Mr. Hentgen "would be quite a mess at the end of the day" because "he was such a hard worker" and "got into anything you told him to do."

Ms. Farrar testified that, during the same time period when her grandfather was exposed to Georgia–Pacific products at the Forrestal Building, she did her family's laundry, which

included her grandfather's dusty work clothes. She testified that she "would shake his clothes out really, really well" when she did the laundry because she was "concerned about all that dust kind of clogging up the drain in the washer" and concerned that "those particles of stuff would stick to my navy blue [cheerleading outfit]." In the words of Ms. Farrar, this shaking produced visible "whitish, kind of whitish-grayish, loose, fluffy" dust. After thoroughly shaking the dust off of the clothing, she swept the dust up from the floor and placed it in the garbage. She testified that laundry was done, primarily by her and her sister, once a week.

Furthermore, expert testimony showed that Ms. Farrar, from doing her grandfather's laundry, was exposed to dangerous quantities of asbestos dust. Mr. Jerry Lauderdale, an expert in the field of industrial hygiene as it relates to asbestos fiber, testified that the presence of visible dust in the air constitutes an asbestos content of between 100,000 and 1,000,000 times the ambient air level. He testified that "[a]t that level, [the asbestos particles] would be many, many times above safe levels . . . ." In addition, Dr. Maddox testified that "it requires five million particles per cubic foot or more to give you a visible dust." He stated that, based on several epidemiological studies, "epidemiology has shown that even with just a small increase over background environmental levels, one starts to encounter a risk of developing mesothelioma. And that risk increases as the cumulative dose of asbestos increases. So big cumulative dose, big risk. Small cumulative dose, small risk." According to Dr. Maddox, there is no safe level of exposure to asbestos above the background rate (ambient air), and exposure to asbestos in excess of background levels would gradually increase the risk of developing mesothelioma. When considering all of the evidence *in toto,* Dr. Maddox opined that Ms. Farrar's exposure to asbestos from the Georgia–Pacific product was a contributing factor in the development of her mesothelioma.

Collectively, this rather expansive evidence of "dustiness" at the workplace and at the home, which bears on the likelihood of the existence of respirable asbestos fibers, *see Scapa,* 418

Md. at 507, 16 A.3d 159, was sufficient to warrant jury consideration on the issue of the regularity of the exposure.

 The last prong of the *Balbos* test requires evidence of the proximity of the plaintiff, "in distance and in time," to the use of the product. *Balbos,* 326 Md. at 210, 604 A.2d 445. Ms. Farrar's exposure to the asbestos dust did not occur in close proximity to the use of the product. Georgia–Pacific's product was used at the Forrestal Building and Ms. Farrar's exposure to its product was in her household after her grandfather brought his work clothes home to be washed. This distant proximity, however, will not shield Georgia–Pacific from liability. While there is a gap in distance and time between the use of the product and Ms. Farrar's exposure, the jury could reasonably infer that the dust that Ms. Farrar shook off of Mr. Hentgen's clothes was the same dust that accumulated on Mr. Hentgen at the workplace. Moreover, the jury could reasonably infer that much of this dust originated from a drywall product manufactured by Georgia–Pacific. The proximity in distance and in time between the use of the product and Ms. Farrar's exposure was significant enough to permit a jury question on the issue.

The facts in the case before us are similar to those in *ACandS, Inc. v. Abate,* 121 Md.App. 590, 680, 710 A.2d 944 (1998). In that case, commonly referred to as *Abate II,* one of five trial plaintiffs, Frederick Glensky, recovered damages at trial against various companies involved with asbestos work. *Id.* at 604–06, 710 A.2d 944. One such company was Hampshire, Industries, Inc. ("Hampshire"), a contracting company that used asbestos products of other asbestos manufacturing companies. *Id.* at 604, 710 A.2d 944. Frederick Glensky "was the son of a steamfitter, Robert Glensky." *Id.* at 677, 710 A.2d 944. Terry Theis, a co-worker of Robert Glensky's, alleged that he and Robert Glensky were exposed to hazardous asbestos products while working at various job sites. *Id.* at 625, 710 A.2d 944. Frederick "alleged that he was exposed to asbestos when, as a child, he shook the dust off his father's clothes every evening." *Id.* at 625, 710 A.2d 944. Notably,

Robert Glensky did not work directly with the Hampshire spraying product. Thus, Frederick Glensky was a bystander to a bystander of a Hampshire asbestos product. The jury found Hampshire liable to Frederick Glensky for exposures from 1962 to 1964, when Frederick was about 12 years old. *Id.* at 680, 710 A.2d 944. On appeal, Hampshire argued that the evidence was not sufficient to establish that any exposure to its product was a substantial factor in causing Frederick's illness. *Id.*

The Court set out the relevant evidence that was presented at trial:

> To recount, Theis testified that Robert Glensky worked with him in the boiler room at Murphy Homes while Hampshire was spraying. Theis testified that the room was the size of a courtroom, and that the spray created so much dust that he wouldn't have been able to see the jury from the witness stand. Theis specifically recalled that Robert Glensky's clothes were covered with white dust. Hampshire employee Eston Bonner told the court that the spraying process created so much dust that workers in other trades would complain and, at times, "tempers would flare, and people would get mad."

*Id.* at 680, 710 A.2d 944. The Court then discussed various medical testimony that explained how exposure to such dusty clothing might induce asbestos related diseases. One physician, Dr. Kipen, testified that Frederick "probably had . . . asbestos exposure as a consequence of his father's employment in . . . occupations that entailed asbestos exposure." *Id.* "Dr. Kipen concluded that each and every exposure that Glensky had was a substantial contributing factor in the causation of his disease." *Id.* at 680–81, 710 A.2d 944. Indeed, a "medical doctor called by the defendants confirmed that household exposure to asbestos dust, such as that caused by shaking out dusty clothing, 'can cause disease, there is no doubt about it.'" *Id.* at 681, 710 A.2d 944.

Based on this evidence, we concluded:

In sum, there was evidence that Glensky's father was exposed to spraying by Hampshire, that he carried dust from the spraying home on his coveralls, and that Glensky was exposed to the dust when he shook off the coveralls. There was medical testimony that household exposure to asbestos dust can cause disease. The evidence was sufficient to permit the jury to conclude that Glensky's exposure was a substantial factor in causing his illness.

*Id.*

Essentially the same evidence exists in this case. Based on an independent analysis under the *Balbos* "frequency, regularity, proximity" test, coupled with our analysis in *Abate II*, Ms. Farrar presented sufficient evidence for the jury to find that Georgia–Pacific's asbestos product was a substantial factor in causing her mesothelioma.

### (2)

Secondly, we must address Georgia–Pacific's claim that Ms. Farrar presented the jury with the wrong standard for finding that Georgia–Pacific's product caused her disease.

As a preliminary matter, this contention was not argued before the trial court. At the trial court level, Georgia–Pacific repeatedly argued that Ms. Farrar did not produce enough evidence to satisfy the three pronged *Balbos* test. However, Georgia–Pacific never argued that the jury was led to believe "that any exposure to any purportedly 'low dose' of asbestos above background levels is a substantial factor in causing mesothelioma." This is a new argument on appeal and thus has not been preserved. *See* Rule 8–131(a).

We will nonetheless assume, for the purpose of this opinion only, that the argument has been preserved and address the merits of Georgia–Pacific's argument. Georgia–Pacific contends that Farrar "[i]nstead of proving exposure to fibers from Ready–Mix was sufficient to cause mesothelioma, ... argued that any exposure to an amount of asbestos exceeding 'background' ambient asbestos in the environment—even to just one fiber—constitutes a substantial contributing cause of

injury if it increases *the risk of injury.*" (Emphasis in brief). Ms. Farrar does not dispute that "[t]he consistent medical testimony in this case, as well as other such cases tried in this state, is that exposure to asbestos above the background level of ambient air contributes to the cumulative dose which results in an individual contracting mesothelioma." Ms. Farrar points out, however, that Georgia–Pacific's argument "ignores the fact that it is the jury that determines whether the exposures to the Appellant's products constituted a significant contributing factor in the development of Ms. Farrar's mesothelioma." We agree with Ms. Farrar. This issue was addressed in *Linkus,* 190 Md.App. 217, 988 A.2d 511. Among other things, *Linkus* discussed "whether appellant's products were capable of emitting respirable asbestos fibers in sufficient quantities to be a substantial contributing cause of appellee's mesothelioma." *Id.* at 222, 988 A.2d 511. John Crane, Inc., argued "that recently, courts have recognized that 'generalized expert opinions declaring that any exposure to asbestos, however minimal, is a substantial factor in the development of asbestos disease, are insufficient to establish causation.'" *Id.* at 236, 988 A.2d 511. In response, counsel for Mr. Linkus argued "that fiber release in sufficient quantities can be inferred circumstantially from [the lay testimony of witnesses], supported by appellee's expert witnesses, who together established that appellee met the frequency, proximity, and regularity test with respect to exposure to appellant's product and that the exposure was a substantial contributing cause of appellee's mesothelioma." *Id.* at 236, 988 A.2d 511. Our Court agreed with Mr. Linkus. Judge James Eyler, writing for the Court, stated the following:

> We conclude that lay testimony describing the amount of dust created by handling the products in question, coupled with expert testimony describing the dose response relationship and the lack of a safe threshold of exposure (above ambient air levels), was sufficient to create a jury question. There was lay testimony that appellee worked with appellant's products regularly and frequently and the products produced considerable visible dust. Given the testimony as

to the relatively high asbestos content of appellant's [product], and the fact that it was unencapsulated or otherwise treated, the jury could reasonably infer that the products emitted asbestos fibers in sufficient quantities to cause mesothelioma. Appellee produced expert testimony that, assuming that appellee worked with appellant's products, and assuming that the products emitted respirable fibers, the exposure was a substantial factor, not dependent on a comparative analysis of other products.

*Id.* at 238, 988 A.2d 511.

 Thus, contrary to Georgia–Pacific's suggestion, Ms. Farrar was not required to produce explicit expert testimony for the proposition that Ready–Mix was a substantial factor in causing Ms. Farrar's disease. Ms. Farrar needed to produce evidence of proximate exposure to a specific product on a regular basis over an extended period of time. *Id.* Once evidence of this kind was produced, it was up to the jury to determine whether this exposure was sufficient to meet the "frequency, proximity and regularity" test as laid out in *Balbos.* As long as Ms. Farrar produced *some* evidence of frequent, proximate and regular exposure to a Georgia–Pacific product, it was the jury's role to decide whether this evidence was enough to call the product a substantial factor in causing Ms. Farrar's disease.

In this case, the jury instructions clearly stated that the plaintiff must prove "that asbestos from the defendant's product was a substantial factor in causing [her illness]." The jury was instructed:

In determining whether any asbestos products manufactured, sold, supplied or installed by the defendant were a substantial factor in producing injury to any plaintiff, you should consider:

(1) the nature of the product;

(2) the frequency of its use;

(3) the proximity, in distance and in time, of a plaintiff to the use of a product;

(4) the regularity of the exposure of the plaintiff to the use of that product; and

(5) medical causation of the plaintiff's particular disease.

The plaintiff must prove that she was in sufficiently close proximity to an asbestos-releasing product, with sufficient frequency and regularity, *to justify a reasonable inference* that the product was a substantial factor in causing her alleged disease. The proof must be based on evidence and *may not be based to any degree on conjecture, speculation, or guesswork.*

(Emphasis added). As the jury instructions make clear, a jury is permitted to *infer* from the evidence of exposure that a defendant's product is a substantial factor in causing a disease.

 Based on the expert medical testimony establishing asbestos as the cause of Ms. Farrar's mesothelioma, Mr. Galvagna's testimony about Ready–Mix as one of the products creating asbestos dust that attached to Mr. Hentgen's clothing, and Ms. Farrar's testimony regarding exposure to such dust from shaking out Mr. Hentgen's clothing, the jury could reasonably find that Georgia–Pacific's product was a substantial factor in bringing about Ms. Farrar's disease. *Pransky*, 369 Md. at 366–67, 800 A.2d 722 (determining whether the defendant's product was a substantial factor in bringing about plaintiff's injuries is a question for the jury); *Cf. Linkus*, 190 Md.App. at 237, 988 A.2d 511 ("The jury was asked to determine ... whether appellee's exposure to appellant's products was a substantial contributing factor in the development of appellee's mesothelioma...").

This was the same approach that we adopted in *Grimshaw*. In that case, we upheld a denial of a motion for judgment submitted by Anchor Packing Co., stating that "[a] litigant is entitled to have his theory of the case presented to the jury if that theory of the case is a correct exposition of the law and there is some evidence in the case to support it." *Grimshaw*, 115 Md.App. 134, 185, 692 A.2d 5 (1997) (citations omitted). In *Grimshaw*, we concluded "that there was sufficient evidence presented to establish Grimshaw's theory and therefore,

that the trial court properly submitted the issue to the jury."
*Id.* at 186–87, 692 A.2d 5. We reasoned:

> As long as plaintiff has presented some evidence to support his theory of liability, the trial court should submit the issue to the jury. Then, it is the duty of the jury, as trier of fact, to weigh the evidence and determine whether the plaintiff has proven by a preponderance of evidence that the plaintiff has mesothelioma, he worked in proximity to the defendant's product, and inhaled asbestos fibers from the product of a particular defendant.

*Id.* at 187 n. 11, 692 A.2d 5 (citing *Owens–Illinois, Inc. v. Armstrong*, 326 Md. 107, 119, 604 A.2d 47 (1992)). Therefore, as in *Grimshaw*, our job is to ask whether there was any evidence adduced at trial from which a jury could reasonably conclude that the Ready–Mix product sold by Georgia–Pacific was a substantial factor in the development of Ms. Farrar's mesothelioma. *Id.* at 186, 692 A.2d 5. Evidence of this kind did exist in this case and the trial judge did not err in submitting the substantial factor question to the jury.[5]

---

**5.** We will briefly comment upon an additional matter. On June 29, 2012, this Court filed its opinion in *Dixon v. Ford Motor Co.*, 206 Md.App. 180, 47 A.3d 1038 (2012). In that case, the plaintiff's expert opined that "every exposure to asbestos," even a single event, "is a substantial contributing cause" in the development of mesothelioma. *Id.* at 186, 47 A.3d 1038. We held that such testimony "lacked any information that would 'assist the trier of fact to understand the evidence or to determine a fact in issue' as required by Rule 5–702," *id.* at 202, 47 A.3d 1038, and that such testimony was inadmissible without quantitative epidemiological evidence supporting its conclusions. *Id.* at 197, 47 A.3d 1038.

Shortly after *Dixon* was filed, appellant's counsel wrote this Court and suggested that: "[i]n *Dixon*, the Court reversed a judgment ... based on the erroneous admission of extremely similar expert testimony [to that in Ms. Farrar's case]...." Initially, we note that no argument analogous to the *Dixon* Court's analysis was presented to the trial court. Moreover the expert testimony in Ms. Farrar's case was different from that in Ms. Dixon's in at least one significant respect.

In contrast to *Dixon*, the trial court in Ms. Farrar's case did *not* allow her expert to testify that her exposure to Georgia–Pacific's product was a *substantial* cause of her illness. Instead, the court permitted the expert to testify that the exposure was "a contributing factor," but not a "substantial factor" because, as the trial court explained, "you need to

## III. The Jury Verdict

■■ Question ten on the verdict sheet addressed damages. Initially, the jury returned a verdict of $95,575 for past medical expenses; $75,000 for future medical losses; $1,600,000 for future economic losses; and a verdict of "undetermined" for past and future noneconomic losses. After the foreperson expressed this verdict, the trial court immediately requested that counsel approach the bench to discuss the verdict of "undetermined." The court and counsel discussed what the phrase "undetermined" could mean in this context, and how best to move forward to obtain a complete verdict. The trial judge stated that "undetermined" "could be zero. It could be 10 million, or they may not be in agreement. If they're not in agreement, they're deadlocked on that." The court suggested that reading an *Allen* charge [6] may be the

---

prove that [the exposure was a substantial factor] through the evidence presented," not through a conclusory statement by an expert. The distinction between "substantial" and "contributing" is important because legal liability is based on proof that exposure of a defendant's product was a substantial cause of the plaintiff's disease. *See Linkus*, 190 Md.App. at 237, 988 A.2d 511 ("The jury was asked to determine ... whether appellee's exposure to appellant's products was a substantial contributing factor in the development of appellee's mesothelioma...."). The expert testimony in *Dixon* effectively equated any exposure with legal liability. In Ms. Farrar's case, no such testimony was permitted.

It would be fundamentally unfair to the litigants to decide this case on an issue not raised at the trial court nor, for that matter, briefed to us. We decline to do so and merely note without further comment one possible difference between *Dixon* and the case before us.

**6.** The reference is to *Allen v. United States*, 164 U.S. 492, 501, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (approving an instruction that it was the duty of deadlocked jurors, among other things, to "listen, with a disposition to be convinced, to each other's arguments; that, if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself."). The traditional *Allen* charge has been long and widely criticized and the Court of Appeals has repeatedly disavowed its use. *See Goodmuth v. State*, 302 Md. 613, 616–22, 490 A.2d 682 (1985) (collecting cases and authorities). The actual instruction given by the trial court in this case differed significantly from the traditional *Allen* charge. *See* note 7.

most appropriate course of action. In response, counsel for Georgia–Pacific stated: "I mean, I guess it is the predicate of what you say before you read that. I don't want them to go back to the jury room and feel that because they have been sent back, they ... have to put an amount there." Eventually, the court read to the jury Maryland Civil Pattern Jury Instructions 1.14 (addressing the need for a unanimous verdict) and 1.15 (a modified *Allen* Charge, again addressing the need for a unanimous verdict).[7]

Georgia–Pacific contends that the court's course of action had numerous flaws. First, Georgia–Pacific argues that the court "confused ambiguity with deadlock, giving the standard charge for breaking deadlocks and presuming the existence of a deadlock without asking the jury to see if it had been unable to reach a verdict." Second, Georgia–Pacific asserts that the court's instructions "exacerbated the confusion ... because the coercive charge was not responsive to the problem at hand"; namely, Georgia–Pacific contends that the court:

(1) did not inform the jury of any purported defect in the initial verdict; (2) did not ask the jury to clarify its initial response; (3) did not poll the jurors or ask the foreperson what the jury had intended by its verdict of "undetermined"; (4) did not advise the jury how to put its initial verdict into an acceptable form; (5) did not advise the jury

---

7. MPJI–Cv 1:14 Conclusion—Unanimous Verdict.

In order to reach a verdict in this case, each of you must agree upon it. Your verdict must be unanimous.

MPJI–Cv 1:15 Deadlocked Jury Charge.

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

Do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment.

Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.

that it should inform the court if the jurors could not agree on an amount to award in non-economic damages; and (6) strongly suggested that the jury had to put a number in the space for noneconomic damages. . . .

Ms. Farrar responds that court did not err because "[t]he proper method to resolve that circumstance is to allow the jury the opportunity to discuss the issue further in an effort to arrive at a proper conclusion." We conclude that the trial court did not err in instructing the jury as it did.

There is no question that the jury's response of "undetermined" to the court's question about non-economic losses was ambiguous. As the trial court noted, it could mean "zero. It could be 10 million, or they may not be in agreement." The question is whether the court dealt with this ambiguity in an improper manner.

The Court of Appeals has "addressed a trial judge's obligation to refrain from coercive language in a number of occasions in which the jurors had provided ambiguous answers during post-verdict polling." *Butler v. State*, 392 Md. 169, 187, 896 A.2d 359 (2006). The Court stated that, although the trial judge may question the jurors,

> in doing so, . . . the court must be careful not to influence or coerce the juror's decision during the course of the questioning. . . . The influence of the trial judge on the jury is necessarily and properly of great weight, and jurors are ever watchful of the words that fall from him. And we have warned that the law does not permit the judge to suggest the alteration of a verdict in substance. He must not throw the weight of his influence into the deliberations of the jury as to matters exclusively within their province.

*Id.* at 187–88, 896 A.2d 359 (citations and quotation marks omitted).

In this case, the jury, as a collective unit, expressed that it was undetermined about the amount of non-economic damages that should be awarded to Ms. Farrar. As we will discuss, the trial court was aware that too much involvement might unduly influence the jury's verdict and chose to send the jury back for

further deliberations on the issue. This action is improper under these facts only if it coerced the jury into thinking that it could not award a non-economic damages amount of zero. Georgia–Pacific argues that this was coercive because it "strongly suggested that the jury had to put a number in the space for non-economic damages." We do not agree.

In cases like these the Court of Appeals has stated that the trial judge has a limited number of options at his or her disposal. As the Court expressed in *Lattisaw v. State*, 329 Md. 339, 347, 619 A.2d 548 (1993):

> To cure the ambiguity in [the juror's] verdict, the trial court may have employed either of two options. The safest course would be for the court to send the jury out for further deliberations ... with the simple instruction that their verdict must be unanimous. Alternatively, the trial court may attempt to clarify the juror's ambiguous response by questioning the juror directly.

In this case, the trial judge chose the safer course. In complying with the procedure approved by the Court of Appeals, the trial court dismissed the jury for further deliberations. The additional instructions read to the jury, MPJI–CV 1.14 and 1.15, were properly issued and were not coercive. The court, in rejecting Georgia–Pacific's suggestion that the court should discuss the matter with the jury foreman, stated:

> I thought about it. I don't think that is appropriate, because that puts us ... in fact, I think you said that, that puts us into their deliberations more than I am comfortable. Like I said, I threw it out there. And, I'm not comfortable with doing that.

The trial court was careful not to influence or coerce the juror's decision by inserting itself into the jury's deliberations. This was a legitimate exercise of discretion. The trial court did not err in the way it instructed the jury to deliberate further on the issue of non-economic damages.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED.**

**APPELLANT TO PAY COSTS.**